IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TROVARE CAPITAL GROUP, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | FILED: MAY 30, 2008 |
| vs. | ) NO: | 08CV3133  RCC |
| | ) | JUDGE GETTLEMAN |
| SIMKINS INDUSTRIES, INC., | ) | MAGISTRATE JUDGE NOLAN |
| HARVARD FOLDING BOX CO., INC., | ) | |
| LINDEN-SUMMER REALTY CO., INC., | ) | |
| and SOUTH UNION COMPANY, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Now Comes the Plaintiff, TROVARE CAPITAL GROUP, LLC, by and through its attorney, Ronald A. Stearney, Jr., and complaining of the Defendants, SIMKINS INDUSTRIES, INC., *et al*, states as follows:

### PARTIES

1. Plaintiff, TROVARE CAPITAL GROUP, LLC is an Illinois Limited Liability Company with its principal place of business in Lake Forest, Illinois. All members of TROVARE CAPITAL GROUP, LLC are Illinois Residents.

2. Defendant, SIMKINS INDUSTRIES, INC. is a Delaware Corporation with its corporate headquarters at 260 East Street, New Haven, CT 06511.

3. Defendant HARVARD FOLDING BOX CO., INC. is a Massachusetts corporation with its principle place of business at 71 Linden St., Lynn, MA 01905. Upon information and belief, HARVARD FOLDING BOX CO., INC. is a subsidiary of SIMKINS INDUSTRIES, INC.

4. Defendant LINDEN-SUMMER REALTY CO., INC. is a Massachusetts corporation with its principle place of business at 71 Linden St., Lynn, MA 01905. Upon information and belief, LINDEN-SUMMER REALTY CO., INC. is a subsidiary of SIMKINS INDUSTRIES, INC.

5. Defendant SOUTH UNION COMPANY, INC. is a Massachusetts corporation with its principle place of business at 71 Linden St., Lynn, MA 01905. Upon information and belief, SOUTH UNION COMPANY, INC. is a subsidiary of SIMKINS INDUSTRIES, INC.

## JURISDICTION

6. Jurisdiction exists by virtue of diversity of citizenship, as provided in 28 U.S.C. Section 1332 and pursuant to 735 ILCS 5/2-209. The amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs. Venue is proper in this judicial district court under 28 U.S.C. Section 1391(a)(1) and 1391 (c).

## FACTS COMMON TO ALL COUNTS

7. Defendants sought to sell their business and hired Mesirow Financial, Inc. of 321 North Clark Street, Chicago, Illinois to act as its agent in order to sell the business.

8. Negotiations occurred in Illinois between the Plaintiff and Mesirow regarding the sale of the Defendants' business. Mesirow and Plaintiff negotiated and drafted a letter of intent (hereafter "LOI") to purchase Defendant's business. (LOI attached as Exhibit A).

9. The LOI specifically refers to the Defendants and Mesirow Financial as, collectively, "Sellers".

10. On May 23, 2007, Plaintiff and Defendants accepted the LOI which laid out the intentions of the parties to enter into a contract. The LOI set forth certain understandings and intentions of the parties in which the Plaintiff would purchase all of Defendants' operating assets. The LOI designated Plaintiff as the "Buyer" and Defendants (including Mesirow) collectively as the "Seller". (Exhibit A).

11. Both parties agreed in the LOI that the letter would be governed by the laws of the State of Illinois without regard to conflict of laws. (Exhibit A at paragraph 18).

12. Paragraph 16 states that the LOI creates rights in favor of the parties as to paragraphs 11, 12, 13, 14, 15, and 16, each of which is ***fully binding and enforceable by each of the parties***. (Exhibit A at paragraph 16). [emphasis added].

13. Paragraph 13 of the LOI, entitled "Exclusive Dealing", sets forth a 90-day period, effective from the date that the LOI was executed, in which Seller agreed not to sell or transfer the assets or partial assets of the Seller, nor engage in any negotiations, discussions, or agreements thereof, with any party other than Plaintiff. (Exhibit A at paragraph 13).

14. Paragraph 14 of the LOI sets forth a "Break-Up Fee" (hereinafter "Fee") and states as follows:

> "If the Seller or any other shareholder of Seller breaches paragraph 13 [Exclusive Dealing] of this letter **or the Seller provides to Buyer written**

3

       **notice that negotiations toward a definitive asset purchase agreement are terminated**, then Seller shall pay Buyer a breakup fee of two hundred thousand dollars ($200,000). (Exhibit A at paragraph 14). [emphasis added].

15. Paragraph 14 also provides that if the Seller consummates a transaction relating to the sale or transfer of the Seller's assets either in whole or partial part within six months after the termination date, the Seller is liable to Buyer for a sum equal to two percent (2.0%) of the purchase price. (Exhibit A at paragraph 14).

16. Upon information and belief, all or partial assets of the Seller were transferred to a David Simkins on or around January 18, 2008.

17. Defendants have not responded to Plaintiffs attempts to complete the transaction as laid out in the LOI.

18. Defendants have refused to cooperate in the due diligence period.

19. Defendants have refused to deliver a written notice of termination to the Plaintiff.

20. Defendants have not paid the Break Up fee or a transfer fee to Plaintiffs as required by the legally binding and enforceable provisions of the letter of intent.

21. Plaintiff has demanded payment of the break up fee and Defendants have refused.

22. Plaintiff has expended significant funds, time and effort in order to consummate the transaction. All of the funds expended were drawn on Illinois banks.

4

## COUNT I

## BREACH OF CONTRACT

23. Plaintiff reincorporates and re-alleges paragraphs 1-22 as though set forth fully herein as paragraph 23.

24. The LOI contains provisions that both parties agreed would be legally binding regardless of whether a final contract was ever executed.

25. Paragraphs 11-16 of the LOI are fully binding and enforceable and therefore create a valid contract between the parties.

26. Plaintiff performed all of its obligations under the contract.

27. Defendants' refusal to provide Plaintiff with a written notice of termination constitutes bad faith dealing.

28. Defendants have breached the contract and are liable for said breach in that they have refused to pay the break up fee on demand.

29. As a consequence of the foregoing, Plaintiff has suffered damages.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the Defendants in the principal amount of $200,000 plus prejudgment interest, post-judgment interest, attorneys fees, costs and such other relief that the Court deems fit and proper.

## COUNT II

## BREACH OF CONTRACT

## (IN THE ALTERNATIVE)

30. Plaintiff reincorporates and re-alleges paragraphs 1-22 as though set forth fully herein as paragraph 30.

31. The LOI contains provisions that both parties agreed would be legally binding regardless of whether a final contract was ever executed.

32. Paragraphs 11-16 of the LOI are fully binding and enforceable and therefore create a valid contract between the parties.

33. Plaintiff performed all of its obligations under the contract.

34. Upon information and belief, the assets of Seller have been transferred to a party other than the Plaintiff in violation of paragraph 13 of the LOI that ensured Seller's Exclusive Dealing with Plaintiff. (Exhibit A at paragraph 13).

35. Defendants have breached the contract by transferring Sellers' assets either in whole or partial part to a third party.

36. Defendants' conduct during the exclusivity period constitutes bad faith dealing.

37. Pursuant to paragraph 14 of the LOI, Defendants are liable to Plaintiff for the sum of two percent (2.0%) of the purchase price that Defendants received for the transfer of assets. (Exhibit A at paragraph 14).

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the Defendants in the principal amount of two percent (2.0%) of the purchase price of the transfer of Defendants' assets to a third party, plus prejudgment interest, post-judgment interest, attorneys fees, costs and such other relief that the Court deems fit and proper.

## COUNT III

## DECLARATORY RELIEF

38. Plaintiff reincorporates and re-alleges paragraphs 1-37 as though set forth fully herein as paragraph 38.

WHEREFORE, Plaintiff, TROVARE CAPITAL GROUP, LLC, prays that this Court enter judgment in its favor and against Defendants, SIMKINS INDUSTRIES, INC. et al, and declare that:

A. Paragraphs 11-16 in the LOI formed a valid contract between the parties because they were expressly stated to be legally binding and enforceable regardless of whether a final contract was ever executed.

B. Defendants refusal to provide Plaintiff with a written notice of termination is in and of itself a termination notice.

C. Defendants are in breach of the valid contract between the parties.

D. Defendants are obligated to pay Plaintiff a break up fee in the sum of $200,000 if this Court finds that Defendants terminated the contract.

E. Defendants are obligated to pay Plaintiff a break up fee in the sum of two percent (2.0%) of the purchase price if this Court finds that Defendants violated the exclusivity agreement by transferring assets to a third party.

F. Plaintiffs are entitled to any other relief that this Court finds just and equitable.

Respectfully submitted,

TROVARE CAPITAL GROUP, LLC.


<u>By:/s/Ronald A. Stearney, Jr.</u>
RONALD A. STEARNEY, JR.
Attorney for Plaintiff


49597
Ronald A. Stearney, Jr.
**Law Offices of Ronald A. Stearney**
211 W. Wacker Drive, Suite 500
Chicago, IL 60606
312-456-6900
312-456-6902 (Fax)
ron@stearneylaw.com



**TROVARE**
CAPITAL GROUP..

May 22, 2007

**PRIVATE AND CONFIDENTIAL**
Mr. Leon Simkins
c/o Mr. Bill Hornell
Mesirow Financial, Inc.
321 North Clark Street
13th Floor
Chicago, IL 60610

Re: Proposal to Purchase Assets of the Company

Dear Mr. Simkins:

Trovare Capital Group has been engaged in preliminary discussions regarding the proposed acquisition by an entity to be formed by Trovare Capital Group ("Buyer") with representatives of Simkins Industries, Inc and the various entities that own the assets for the five operating locations as described in the Information Memorandum circulated by Mesirow Financial (collectively "Seller") regarding the proposed acquisition by Buyer of Seller's folding carton business assets. This letter will confirm that Buyer is interested in acquiring substantially all of the assets of Seller, and assuming certain of its obligations on the terms and conditions outlined below.

This letter does not constitute a legally binding or enforceable agreement or commitment on the part of Buyer or Seller with respect to the matters described herein, except as otherwise expressly provided in paragraph 16 below (Certain Binding Provisions). We believe that we have incorporated the items and edits from the draft term sheet into the letter. The purpose of this letter is to set forth generally certain understandings and intentions of Buyer and Seller

    1) <u>Acquisition of Assets of the Seller</u>. At the closing of the acquisition (the "<u>Closing</u>"), Buyer would acquire all the operating assets of Seller whether tangible or intangible (collectively, the "<u>Purchased Assets</u>") including, without limitation the net working capital (excluding cash, pre-paid pension funding, and any intercompany or related entity balances), machinery and equipment, real estate, tools, inventory, raw materials, supplies, furniture and fixtures, computer hardware and software, contract rights, customer information, trade names, goodwill and other intangible assets for each of the following locations: Trenton, New Jersey ("Trenton"), Landrum, South Carolina ("Landrum"), Marietta, Georgia ("Marietta"), Lynn, Massachusetts ("Harvard"), and Lawrence, Massachusetts ("Ideal"). Collectively, these locations are referred to as the Business ("Business"). The Purchased Assets shall be delivered to Buyer free and clear of any lien, claim, mortgage, pledge, security interest, encumbrance, transfer or transaction tax or imposition or charge of any kind except as described below.

2) <u>Assumption of Liabilities</u>. At the Closing, the Purchased Assets will be free and clear from all indebtedness and liabilities, except for stated and agreed current operating accruals of the

Business and specific operating obligations under certain scheduled contracts which relate to the operation of the folding carton business by Buyer after the Closing Date (collectively, the "Assumed Liabilities"). The Assumed Liabilities would presumably include operating obligations listed in Current Liabilities. The Assumed Liabilities would exclude, and the Buyer would not assume, any other liabilities or obligations of the Seller including any obligations in respect of indebtedness, taxes or employee benefit plans.

3) Purchase Price. In consideration of the sale of the Purchased Assets, the Purchase Price would be $25.1 million ($25,100,000.00) and would be paid in cash in the following manner:

(a) At the Closing, Buyer would pay the Seller the sum of $25,100,000 in cash at Closing (the "Cash Consideration")

As the Parties have discussed, the Purchase Price herein is based on the information provided in the Information Memorandum circulated by Mesirow (the "Info Memo") and will be subject to due diligence by Buyer to confirm the information presented. The Purchase Price may change at the closing as described in paragraph 4 below.

4) Working Capital Adjustment. The Purchase Price Cash Consideration would be increased or decreased by the amount that (A) the current assets of the Seller (excluding any cash and cash equivalents) as of the Closing Date less (B) the current liabilities of the Seller as of the Closing Date ("Net Working Capital"), are more or less than the amount necessary to operate the Business consistent with past practice. If the closing Net Working Capital total exceeds the September 30, 2006 total for Trenton, Marietta and Landrum, and the July 31, 2006 working capital for Harvard and Ideal (the "Target Net Working Capital") as detailed in Appendix A attached hereto, then the Purchase Price would be increased on a dollar-for-dollar basis at the closing. Likewise, if the closing Net Working Capital is less than Target Net Working Capital, then the Purchase Price would be decreased on a dollar-for-dollar basis at the closing. An inventory count and financial records closure will be done three days prior to closing. Once the inventory count is concluded, the estimated working capital will be determined and the price adjusted for closing. Given the Seller guarantee of the inventory, the Working Capital shall then be subject to review by Buyer during the 90-day period following the Closing to validate payables, receivables, and inventory and other current assets and current liabilities and expedited dispute resolution procedures to be specified in the asset purchase agreement. Please see Appendix A for working capital components as of September 30, 2006 for Marietta, Trenton and Landrum, and July 31, 2006 for Ideal and Harvard (the "Target Net Working Capital").

5) Ideal Inventory. Seller will reimburse Buyer at book value for un-sellable or otherwise obsolete Ideal inventory acquired at the Closing. Buyer and Seller will mutually agree upon the definition of what is considered un-sellable or obsolete in the asset purchase agreement. Seller will place in escrow an agreed upon amount to be determined through January 31, 2008 to ensure that the inventory is salable. The escrow amount and key terms for this guarantee via escrow will be defined and mutually agreed upon through the course of due diligence.

6) Other Provisions. The parties recognize that Buyer must conduct a thorough due diligence investigation and that Buyer shall not be obligated to proceed if it is not satisfied with its findings from such investigation. The asset purchase agreement would contain such representations, warranties and covenants as are agreed to by the parties and would be subject

to conditions to be agreed upon by the parties in their discretion, including obtaining necessary bank and other third party consents and regulatory approvals. The parties recognize, however, that in addition to the other terms to be negotiated, an understanding must be reached with respect to certain matters relating to the employment of the Seller's employees, including the benefits to be offered such employees, and any failure to comply with environmental and other laws prior to the Closing.

As the Parties have discussed, in order to expedite a contemplated closing, the Buyer will order and pay for Phase 1 environmental studies for each of the real estate parcels. Any Phase I studies that are conducted for the properties will be shared with Seller if a problem or concern is revealed within 15 days of receipt by Buyer. Buyer will notify Seller upon receipt of the Phase I reports. Buyer agrees not to disclose any environmental report to parties other than it's agents and representatives without Seller's consent.

7) <u>Agreements and Compensation.</u> Certain members of the management team, including Shareholders of the Business ("Senior Executives"), to be agreed upon, and the Buyer would enter into mutually-agreeable Non-Compete, Non-Solicitation Agreements, or Employment or Consulting Agreements that would provide for fair consideration consistent with current base salaries, as well as non-competition, non-solicitation and confidentiality agreements. Without limiting the foregoing, each of the key people would enter into an Agreement at Closing for a specified period following the Closing on customary terms for a similarly situated executive. Buyer will notify Seller of any problems in securing agreements no less than 30 days prior to closing.

8) <u>Closing.</u> If Buyer chooses to consummate the transaction contemplated by this letter, Buyer and Seller will consummate the transaction on or before September 30, 2007 unless it is mutually agreed to extend the closing. September 30, 2007 will be deemed the termination date ("Termination Date"), provided Buyer can terminate this letter at any time if not satisfied in its sole discretion with any of the due diligence. If Buyer at any time does not choose to go forward with or consummate the transaction contemplated by this letter it shall provide written notice of same to Seller.

9) <u>Conditions.</u> Completion of this transaction would be subject to conditions precedent to Buyer's obligations to close as agreed to by the parties, including the following conditions:

(a) confirmation of normalized net revenue and adjusted EBITDA for the twelve-month period ending December 31, 2006 for Harvard and Ideal, and September 30, 2006 for Trenton, Marietta, and Landrum of at least $55 million and $831,000, respectively.

(b) completion by Buyer and its advisors of a due diligence investigation satisfactory to it, in its sole discretion, of the Business' assets, prospects and other relevant information, including validation of relationships with key clients and approval by Buyer's Board;

(c) negotiation and execution of a purchase agreement satisfactory to Buyer and Seller containing representations, warranties, covenants (including non-compete and other restrictive covenants), indemnities and other terms and conditions, including without limitation, representations and covenants by the Seller and its shareholders and/or members that:

(i) Seller is conveying to Buyer good and unencumbered title to the Purchased Assets;

  (ii) the December 31, 2006, audited financial statements for the Harvard and Ideal facilities, the September 30, 2006 audited financial statements for the Marietta, Landrum and Trenton facilities, and the unaudited 2007 year-to-date financial statements for the period ending July 31, 2007, fairly represent the assets, liabilities and financial condition and results of operations of the Business as of such date;

  (iii) the Business has been conducted by Seller, and until the Closing Date Seller shall continue to conduct the Business only in the ordinary course consistent with its past practices;

  (iv) under certain conditions (as more fully set forth in paragraph 14 hereof) Buyer shall be entitled to a Break-up Fee.

(d) the absence of any material adverse change between December 31, 2005, and the Closing for the Harvard and Ideal facilities and between September 30, 2006 and the Closing for the Marietta, Landrum, and Trenton facilities, in the assets, business, financial condition, or prospects of the Business;

(e) the execution of Employment Agreements and/or non-compete/non-solicit agreements with certain shareholders and key members of senior management on mutually satisfactory terms; and

(f) Buyer shall have received financing commitments acceptable to Buyer in its sole discretion necessary to fund the purchase of the Purchased Assets. Buyer will notify Seller upon receipt of the financing commitment.

10) <u>Access to Information</u>. To enable Buyer and Seller to expeditiously complete the transaction, Seller will provide Buyer and its representatives reasonable access to the books, records, financial statements, properties, personnel, key suppliers, and key customers of the Business. Seller will provide blind customer order history, volumes and related information to Buyer. Seller will inform Buyer as soon as it learns of any significant known, pending or potential customer departures. Buyer and Seller will coordinate and mutually agree upon the timing, scope and content of any customer interaction. Seller agrees to use its reasonable efforts to allow for Buyer's prompt completion of its due diligence investigation and the prompt negotiation of the transaction contemplated hereby. Any proprietary or confidential information disclosed during the course of due diligence, or in the course of the proposed acquisition, will be held in confidence by the parties pursuant to the terms of the Confidentiality Agreement to be entered into by the parties.

11) <u>Expenses</u>. Each party shall pay its own expenses and costs incidental to the negotiation and completion of the acquisition, including legal and accounting fees.

12) <u>Brokerage</u>. Seller agrees to indemnify Buyer against any claim for brokerage fees owed to any broker employed by Seller, and Buyer agrees to indemnify Seller against any brokerage fees owed to any broker employed by Buyer.

13) <u>Exclusive Dealing</u>. In consideration of the time and expense to Buyer associated with the performance of its due diligence, for the 90-day period beginning with the date of execution of this letter, Seller and each of its shareholders will not and Seller agrees to cause its subsidiaries, representatives, members, directors, officers, agents, or employees not to,

directly or indirectly, initiate, solicit, offer, encourage, participate in any discussions or negotiations with, or provide any information to, any person or entity, other than Buyer and its officers, employees, representatives, and agents, concerning any proposal or agreement with respect to any direct or indirect acquisition of all or any substantial portion of the assets of the Business (except for dispositions of assets of the Business in the ordinary course of business). During such period ("Exclusivity Period"), Seller hereby agrees that Buyer will have the exclusive right to negotiate and Buyer will have the exclusive right to enter into an agreement with respect to the direct or indirect acquisition of the Business. For the 90-day period beginning with the date of execution of this letter, Seller and its agents agree to notify Buyer immediately upon the receipt of any communications from third parties regarding any of the transactions described in the previous sentence, and the contents thereof. Failure to execute an asset purchase agreement by the end of the Exclusivity Period shall terminate the Exclusivity Period, though the Exclusivity Period can be extended upon mutual written agreement

14) <u>Break-Up fee.</u> If the Seller or any shareholder of Seller breaches paragraph 13 of this letter or the Seller provides to Buyer written notice that negotiations toward a definitive asset purchase agreement are terminated, then Seller shall pay Buyer a breakup fee of two hundred thousand dollars ($200,000).

If within six months after the date of such breach or the Termination Date, as the case may be, either the Seller or any shareholder of Seller consummates a transaction relating to the acquisition of a material portion of the Seller or its capital stock, assets or business, in whole or in part, whether directly or indirectly, through purchase, merger, consolidation or otherwise (other than sales of inventory or immaterial portions of the Company's assets in the ordinary course) with a buyer that expressed interest in Seller during the Exclusivity Period, then immediately upon the closing of such transaction, the Seller will pay to Buyer a sum equal to two percent (2.0%) of purchase price specified in paragraph 3 above, less any break-up fees previously paid to Buyer. If during the Exclusivity Period Buyer acts in bad faith or with willful misconduct, Seller shall not have to pay a break-up fee.

15) <u>Non-disclosure; Publicity.</u> Each party agrees that it shall not, without the prior written consent of Buyer and Seller, disclose publicly, or to any third party, excluding employees of Seller and its subsidiaries who need to know, the Buyer and its employees, investors, and potential investors in Buyer or its affiliates, and professionals retained in connection with this transaction, the terms and conditions of this letter or the subsequent negotiations between the parties, except to the extent required by law, or as may be necessary to consummate the transaction.

16) <u>Non-Binding Agreement.</u> This letter merely constitutes a statement of Buyer's and Seller's intention with respect to the transaction contemplated hereby, does not constitute an obligation binding on either Buyer or Seller, does not contain all matters upon which agreement must be reached in order for such transaction to be consummated, and creates no rights in favor of any of the parties except for paragraphs 11, 12, 13, 14, 15 and 16 hereof, each of which is fully binding and enforceable by each of the parties. A binding commitment with respect to the purchase of the Business will result only from the execution of the definitive agreement, subject to the conditions expressed therein.

17) <u>Acceptance.</u> This letter must be countersigned by Seller prior to 5:00 p.m. Central Standard Time on May 24, 2007, and will terminate if not so countersigned and returned to

Buyer prior to such time on such date. This letter may be modified only by a writing signed by all parties.

18) <u>Governing Law</u>. This letter shall be governed by the internal laws of the State of Illinois, without regard to conflict of laws.

If the foregoing is agreeable, please sign the enclosed counterpart of this letter and return the same to the undersigned to evidence our agreement. We look forward to working together to consummate this transaction pursuant to the terms and conditions described above.

          Sincerely,

          Randy Cecola on behalf of Buyer

          By: _____
          Trovare Capital Group

Accepted and Agreed
to this 23 day of
_ MAY _, 2007:

By: _____
Leon Simkins
President and CEO Simkins Industries